999 P.2d 1267 (2000)
100 Wash.App. 857
Robert H. MERESSE and Susan P. Meresse, husband and wife, Respondents,
v.
Daniel L. STELMA, a single person; Stanco Financial Corp.; Paul R. Pargeter and Lisa K. Pargeter, husband and wife; John Lee Holland and Penelope D. Paynter, husband and wife; PHH U.S. Mortgage Corp.; Columbia River Banking Company; Kurt S. Rohrbacher and Julee A. Rohrbacher; Riverview Savings Bank; and any other party in possession; Appellants.
No. 24264-8-II.
Court of Appeals of Washington, Division 2.
May 19, 2000.
*1268 Ann Elizabeth Setty-Rosevear, Marsh & Higgins, Vancouver, for Respondents.
Ronald H. Reynier, Hood River, OR, for Appellants.
HUNT, J.
Daniel L. Stelma, Paul R. and Lisa K. Pargeter, John L. Holland, Penelope D. Paynter, and Kurt S. and Julee A. Rohrbacher (Stelma)[1] appeal a trial court judgment declaring invalid amendments to their subdivision's restrictive covenants; the amendments purported to move the common access road, the beginning of which had been constructed outside the recorded easement. Stelma also appeals dismissal of his counter-claim. *1269 Both parties request attorney fees under the restrictive covenants. Holding that a majority of subdivision owners could not expand the road maintenance covenant to force realignment of the access road on a dissenting owner, we affirm.

FACTS
On February 11, 1985, Robert and Brenda Constant recorded a plat for a six-lot residential subdivision, "CONSTANT OAK SUBDIVISION,"[2] in Skamania County. The restrictive covenants for this subdivision provide:

COVENANT FOR ROAD MAINTENANCE:
. . . .
WHEREAS, there is a road [Constant Drive] presently serving the property above described with an easement filed of record for purposes of Ingress, Egress and Utilites [sic] recorded July 6, 1979....
WHEREAS, it is necessary and desirable that a declaration be made as to the maintenance, repairs, and additional constructions involving said road, NOW, it is hereby stated and established that the owner of the lot described above shall share on an equal basis the expense and responsibility for the mainenance [sic], repairs and additional constructions on said existing road above-referenced. It is further stated that maintenance shall include, but not be limited to, the removal of snow and other hazards or obstruction as well as graveling. IT IS FURTHER STATED, THAT THE ROAD SERVICING SAID PROPERTY IS NOT A COUNTY ROAD....
(Emphasis added.)[3] The covenants further provide that the above covenant, as well as others not relevant to this appeal,
shall run with the land, shall be binding upon all parties hereto and all persons claiming upon them, and shall be a part of all transfers and conveyances of the property within said Constant Oaks subdivision.... Such reservations, covenants restrictions, and agreements shall be binding and effective from the date hereof and shall continue indefinitely, or untill [sic] such time as the Skamania County Planning Department and majority vote of the then owners agree to change or alter them in full or in part.

(Emphasis added.) *1270 
Access to the subdivision is by Constant Drive, from Corner Road. The recorded plat depicts the Constant Drive easement as illustrated above. But the mouth of this gravel access road actually intersects Corner Road further east, where Constant Drive cuts across the southwest portion of Lot 6.
The Constants knew about this discrepancy 16 years ago, before their subdivision plat was recorded. In June 1984, during the preliminary platting process, the Skamania County Engineer wrote the Constants:
For a Class IV private road category, for roads serving 6 to 10 lots, the requirements are for 60 feet of right-of-way, 20 feet cleared, 15 feet of driving surface consisting of 6 inches of base rock and 2 inches of top rock. These standards are a minimum....
With respect to the minimum standards, Constant Circle Drive appears to be adequate *1271 as far as width and depth of rock, however, we are concerned about the lack of drainage provisions. The intersection alignment of Constant Circle Drive and Corner Road is not constructed as shown on the preliminary plat drawing, and appears to be outside the designated right-of-way.

(Emphasis added.) Constant Circle Drive was not relocated.
Thirteen years later, in March 1995, the Meresses purchased Lot 1. By 1997, Daniel Stelma owned Lot 2; Paul and Lisa Pargeter owned Lot 3; John Holland and Penelope Paynter owned Lot 4; and Kurt and Julee Rohrbacher owned Lots 5 and 6.
In May or June 1997, the parties attended a "FIRST ANNUAL MEETING FOR: CONSTANT OAKS SUBDIVISION/CONSTANT PRIVATE DR." to discuss, among other things, "Road location and easement equality for all lot owners" and "Creation of a Constant Private Dr. road easement/maintenance agreement by vote." By a vote of five (Stelma) to one (the Meresses), the subdivision owners purported to adopt the following "AMENDMENT TO THE CONSTANT OAKS SUBDIVISION RESTRICTIVE COVENANTS":
WHEREAS, the currently [sic] location of the surfaced roadway of Constant Drive is unfairly burdening and benefiting certain lots within Constant Oaks Subdivision;
. . . .
THEREFORE, ... the Restrictive Covenants of Constant Oaks Subdivision are hereby amended as follows:
1. Constant Drive shall have a gravel surfaced roadway width of twenty (20) feet.
2. The twenty (20) foot gravel surfaced roadway width of Constant Drive shall be centered within the sixty (60) foot roadway easement as shown on the Constant Oaks Subdivision Plat....
3. The remaining twenty (20) feet of roadway easement on each side of the twenty (20) gravel [sic] surfaced roadway width of Constant Drive shall be a scenic easement which shall landscaped [sic] and maintained so that the character of the scenic easement approximates the appearance of the natural surrounding environment....
. . . .
6. The cost of the maintenance, repair and additional construction to Constant Drive to center the roadway, and surface twenty (20) feet of the roadway with gravel, along the entire length of Constant Drive, shall be shared equally by all lot owners within Constant Oaks Subdivision.
The Meresses filed a declaratory relief action,[4] seeking a decree that (1) they "have the exclusive right to the use and enjoyment of that portion of the common area within Constant Oaks Subdivision between [their] lot and Constant Drive as it is now situated"; (2) Stelma has "no right to a view easement or conservation easement on the property of [the Meresses] or the portion of the common area between [the Meresses'] lot and Constant Drive"; (3) "the relocation of Constant Drive" is prohibited; or (4) in the alternative, Stelma is required "to bear the full expense of such relocation, including the resulting diminution in value to [the Meresses'] property." Stelma counterclaimed for declaratory relief, seeking approval of the amendments to the restrictive covenants. Following a bench trial, the court entered findings of fact and conclusions of law and invalidated the amended covenants.
On appeal, Stelma challenges the following conclusions of law:[5]
2. The lot owners do not have had [sic] the power to amend the Covenant for Road Maintenance to provide for road relocation and a scenic easement. The amendment here was a major change *1272 in the original covenant. It not only required the total abandonment of an existing road and its relocation, it also changed the easement from simply a 60 foot wide roadway easement to now what was designated as a 40 foot, (20 foot on either side of the roadway) scenic easement, and the scenic easement put more restrictions on the easement than previously were stated.
3. The authority to amend restrictive covenants is restricted by the limitation that the amendment may not impose restrictions that are more restrictive or burdensome than those imposed by specific objective covenants.
4. This is a restrictive covenants interpretation case and not a contract case.[[6]]
5. The amendment in this case that was decided by majority of the Lot owners went beyond the original intent of the covenant. That is, the original intent was for the construction, maintenance and repair of the Constant Road. In this case, there is, as I said, a relocation, a rebuilding, also a reconfiguration, reestablishment of a different type of easement which is certainly more restrictive than the original roadway easement and it is also more burdensome on the lot owners.
6. The adoption of a more restrictive covenant would require a total, 100% vote, which we do not have here.
At oral argument, both parties asked us to clarify the respective rights of the lot owners.

ANALYSIS

I. STANDARDS OF REVIEW
Where, as here, "the facts are undisputed, and the only issues are questions of law, review is de novo." Wallace Real Estate Inv., Inc. v. Groves, 72 Wash.App. 759, 766, 868 P.2d 149, aff'd, 124 Wash.2d 881, 881 P.2d 1010 (1994). "The interpretation of language contained in a restrictive covenant[[7]] is a question of law." Parry v. Hewitt, 68 Wash.App. 664, 668, 847 P.2d 483 (1992).
Where the interpretation of
restrictive covenants is necessitated by a dispute ... among homeowners in a subdivision... [t]he court's goal is to ascertain and give effect to those purposes intended by the covenants.
Riss v. Angel, 131 Wash.2d 612, 623, 934 P.2d 669 (1997). "In determining intent, language is given its ordinary and common meaning." Riss, 131 Wash.2d at 621, 934 P.2d 669.

II. AMENDMENT OF THE RESTRICTIVE COVENANTS
At issue is whether Stelma, as the owner of a majority of the lots, can override the minority owner, Meresse, to impose a major change  relocating the access road  by calling it "road maintenance," "construction," or "repair," which do not require unanimous approval.
Stelma contends that the power to relocate Constant Drive and to create a scenic easement is given in (1) the original restrictive covenants, which provide in part:
Such reservations, covenants restrictions, and agreements shall be binding and effective from the date hereof and shall continue indefinitely, or untill [sic] such time as the Skamania County Planning Department[[8]] and majority vote of the then owners agree to change or alter them in full or in part.

(emphasis added); and (2) the "COVENANT FOR ROAD MAINTENANCE":
the owner of the lot ... shall share on an equal basis the expense and responsibility *1273 for the mainenance [sic], repairs and additional constructions on [Constant Drive].
Although emphasizing different perspectives, both parties cite Shafer v. Board of Trustees of Sandy Hook Yacht Club Estates, Inc., 76 Wash.App. 267, 273-74, 883 P.2d 1387 (1994), in which Division One held:
[A]n express reservation of power authorizing less than 100 percent of property owners within a subdivision to adopt new restrictions respecting the use of privately owned property is valid, provided that such power is exercised in a reasonable manner consistent with the general plan of the development.

(Emphasis added.)[9] We generally agree with Division One's statement of this rule of law, but add a caveat appropriate to the different facts before us.
In assessing what constitutes "a reasonable manner consistent with the general plan of the development," we look to the language of the covenants, their apparent import, and the surrounding facts. In Shafer, the existing covenants were extended to a restriction of a similar nature restriction on storage of unused automobiles. 76 Wash.App. at 271, 883 P.2d 1387. Such a restriction is similar to the restrictive covenants in place for the Constant Oak Subdivision, particularly those relating to the overall harmonious appearance of the subdivisiondwelling size and tree-cutting.
But Shafer does not address changes in restrictive covenants that differ in nature from those already in existence. We adopt the pertinent rationale of the Nebraska Supreme Court in Boyles v. Hausmann, 246 Neb. 181, 517 N.W.2d 610, 617 (1994):
The law will not subject a minority of landowners to unlimited and unexpected restrictions on the use of their land merely because the covenant agreement permitted a majority to make changes to existing covenants.
Accord Lakeland Property Owners Ass'n v. Larson, 121 Ill.App.3d 805, 77 Ill.Dec. 68, 459 N.E.2d 1164, 1167, 1169 (1984) (holding that a deed's provision, permitting "change[s].. in whole or in part" to restrictive covenants upon majority vote, "clearly directs itself to changes of existing covenants, not the adding of new covenants which have no relation to existing ones "(emphasis added)).
Here, relocation of the access road is an unexpected expansion of the subdivision owners' obligations to share in road maintenance. First, the subdivision provision that allows covenant alteration precedes and refers to relatively circumscribed restrictions on dwelling size and tree-cutting. Second, the "COVENANT FOR ROAD MAINTENANCE" is limited to ordinary types of "maintenance [such as "the removal of snow and other hazards or obstruction as well as graveling"], repairs, and additional constructions on [the] existing road." For example, the other lot owners could arguably include paving the existing gravel road under this provision.[10] But this language does not place a purchaser or owner on notice that he or she *1274 might be burdened, without assent, by road relocation at the majority's whim, especially in light of the apparent permanence of the road in its long-standing, existing location.
We hold that, under the facts of this case and the language of the restrictive covenants, relocation of Constant Drive does not constitute road "maintenance, repairs," or "additional construction on the road." The trial court's invalidation of the amended restrictive covenants was not error.

III. USE OF THE UNIMPROVED EASEMENT
Stelma asks us
to clarify the respective interests of the parties in the platted, but unimproved section of the 60' roadway. The trial court failed to rule on the issue, although it was plead and requested for clarification by the parties.
. . . .
... [I]f this court affirms the trial court, it leaves the respective landowners with no clear directive regarding their respective rights and uses of this platted, but unused road area.
But an appellate court generally will not review a matter on which the trial court did not rule. See RAP 2.4(a).
Nonetheless, the Meresses counter that by invalidating the restrictive covenant amendments, the trial court "affirm[ed] that the easement area abutting one's property is to be exclusively used by the property owner, so long as it is used in accordance with any restrictive covenants which are reasonable and not more restrictive than those now imposed." We agree.
[W]here a right of way is established by reservation, the land remains the property of the owner of the servient estate and he is entitled to use it for any purpose that does not interfere with the proper enjoyment of the easement.
Thompson v. Smith, 59 Wash.2d 397, 407-08, 367 P.2d 798 (1962). Based on the record before us, nothing prevents the Meresses from continuing to make reasonable use of the property "until it is used for the purpose reserved." Thompson, 59 Wash.2d at 407, 367 P.2d 798.

IV. ATTORNEY FEES
The restrictive covenants also address the issue of attorney fees incurred in litigation relating to their enforcement:
If the parties hereto or any future owners of the above described property or their assigns shall violate or attempt to violate any of the covenants, restrictions, reservations or agreements herein from the date of purchase it will be lawful for any other person or persons owning real estate situated in Constant Oaks ... to prosecute any proceedings at law or equity against the persons violating or attempting to violate any restrictions, reservations, covenants, or agreements, and either to prevent him or them from doing so or to recover damages of other dues [sic] from such violation including attorneys fees and court costs.

(Emphasis added.) Stelma seeks attorney fees, arguing that by initiating litigation to invalidate the amended covenants, the Meresses violated "the reserved authority for majority-rule set forth in the [original] restrictive covenants imposed on Constant Oaks Subdivision." But the Meresses were entitled to challenge the amended covenants, which exceeded Stelma's authority.
The Meresses also seek attorney fees, contending that Stelma's attempt to amend the restrictive covenants was an "unreasonabl[e] misus[e] [of] the express powers in the covenants." Contrary to the Meresses' assertion, however, the trial court did not find Stelma's actions unreasonableonly invalid. And the instrument containing the original restrictive covenants merely provided for attorney fees if lot owners violated or attempted to violate "any restrictions, reservations, covenants, or agreements." Stelma's exercise of the majority-vote provision to amend the covenants was not such a violation.
Accordingly, we decline to award attorney fees to either party.
Affirmed.
ARMSTRONG, C.J., and SEINFELD, J., concur.
NOTES
[1] Also listed as appellants are Stanco Financial Corporation, PHH U.S. Mortgage Corporation, Columbia River Banking Company, and Riverview Savings Bank. But they do not appear to be represented by Stelma's appellate counsel, nor does the appellate record clarify their involvement, if any.
[2] The subdivision is labeled "Constant Oaks" in other real property documents.
[3] The instrument also restricts tree cutting and the sizes of mobile homes and other dwellings.
[4] Initially, the Meresses had filed a quiet title action, but then amended their complaint to one for declaratory relief.
[5] In a footnote in their brief, the Meresses disagree with the trial court's conclusion that the February 11, 1985, instrument entitled "RESTRICTIVE COVENANTS IMPOSED ON Constant Oaks" includes the "COVENANT FOR ROAD MAINTENANCE." But the Meresses have not cross-appealed on this or any other issue. Therefore, their disagreement is not before us. Wagner v. Beech Aircraft Corp., 37 Wash.App. 203, 212-13, 680 P.2d 425 (1984); RAP 2.4(a).
[6] As a result of the Supreme Court's decision in Hollis v. Garwall, Inc., 137 Wash.2d 683, 696, 974 P.2d 836 (1999), the treatment of restrictive covenant and contract cases is the same, at least in regard to the use of extrinsic evidence to determine the meaning of words used in the instrument. Although the trial court failed to anticipate and apply this change in the caselaw, its invalidation of the amendments was, nevertheless, correct.
[7] "[A] restrictive covenant limits the manner in which one may use his or her own land." City of Olympia v. Palzer, 107 Wash.2d 225, 229, 728 P.2d 135 (1986) (emphasis omitted).
[8] At trial, the parties stipulated that the "Skamania County Planning Department provided their approval for the amendment of the restrictive covenants in 1997."
[9] Shafer involved a large, up-scale waterfront residential development on Whidbey Island. 76 Wash.App. at 268-69, 883 P.2d 1387. The new covenants adopted by the majority, among other things, prohibited the storage of junk vehicles on individual properties for more than six months. 76 Wash.App. at 271, 883 P.2d 1387. These provisions were adopted for the common good of the subdivision when one or two owners were acting to the detriment of all. 76 Wash.App. at 270, 883 P.2d 1387. Such is not the case here.

The Meresse took no action contrary to the good of the subdivision or the letter or spirit of the existing covenants. They simply used the gravel access road that had been in place for over a decade and objected to being required to bear the burden of its sudden relocation.
[10] Under rules of construction ejusdem generis and noscitur a sociis, the meaning of items in a list is ascertained by "refer[ing] to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope." Moore v. California State Bd. of Accountancy, 2 Cal.4th 999, 831 P.2d 798, 805, 9 Cal.Rptr.2d 358 (1992). See also Southwest Wash. Chapter, Nat'l Elec. Contractors Ass'n v. Pierce County, 100 Wash.2d 109, 116, 667 P.2d 1092 (1983) (Ejusdem generis "requires that general words accompanied by specific words are to be construed to embrace only similar objects."); Shurgard Mini-Storage of Tumwater v. Department of Revenue, 40 Wash.App. 721, 727, 700 P.2d 1176 (1985) (Noscitur a sociis "teaches that the meaning of doubtful words may be determined by reference to their relationship with other associated words and phrases."). Although these canons are typical aids to statutory construction, we find their application useful here.